

**NAILAH K. BYRD**
**CUYAHOGA COUNTY CLERK OF COURTS**
**1200 Ontario Street**
**Cleveland, Ohio 44113**

## Court of Common Pleas

**New Case Electronically Filed:**
**November 1, 2019 22:47**

By: ASHLIE CASE SLETVOLD 0079477

Confirmation Nbr. 1859163

TYRONE HIPPS, JR.                                CV 19 924432

        vs.

CUYAHOGA COUNTY, ET AL                **Judge:**  PETER J. CORRIGAN

**Pages Filed:**  41

# EXHIBIT A

## IN THE COURT OF COMMON PLEAS
### CUYAHOGA COUNTY, OHIO

| | |
|---|---|
| **TYRONE HIPPS, JR.**<br>c/o The Chandra Law Firm LLC<br>The Chandra Law Building<br>1265 West Sixth Street, Suite 400<br>Cleveland, OH 44113<br><br>*Plaintiff,*<br><br>v.<br><br>**CUYAHOGA COUNTY**<br>2079 East Ninth Street<br>Cleveland, OH 44115<br><br>*and*<br><br>**CHRISTOPHER PERDUE**<br>(in his official and individual capacities)<br>c/o Cuyahoga County Department of Law<br>2079 East Ninth Street<br>Cleveland, Ohio 44115<br><br>*Defendants.* | Case No.<br><br>Judge |

### COMPLAINT WITH JURY DEMAND

### NATURE OF THE ACTION

1.      This is a civil-rights action brought to redress the cruel and unjustified attack that Plaintiff Tyrone Hipps, Jr. endured at the hands of corrections officer Defendant Christopher Perdue. Shortly after Mr. Hipps reported to the United States Marshals Service that guards in the Cuyahoga County Corrections Center were engaged in misconduct and criminal activity, one of those guards, Defendant Perdue, grabbed Mr. Hipps and choked him as he attempted to pray. After dragging Mr. Hipps across his jail pod, Defendant Perdue slammed Mr. Hipps headfirst onto the concrete floor, just as other corrections officers arrived on the scene. Mr. Hipps continues to suffer from the effects of this attack, including injuries to his head, neck, legs, wrist, and hands. Mr. Hipps's injuries are expected to last into the foreseeable future.

2.     Defendant Cuyahoga County has cultivated and nurtured a climate of violence and abuse in its jail. The County knew, well before Mr. Hipps was injured, that its officers were abusing incarcerated citizens. Yet it did nothing to prevent or rectify the abuse, leading to the attack on Mr. Hipps.

## PARTIES

3.     Plaintiff Tyrone Hipps, Jr. is a resident of Cuyahoga County. At all times relevant, Mr. Hipps was held in the Cuyahoga County Correctional Center ("the county jail" or "the jail").

4.     Defendant Cuyahoga County is an Ohio political subdivision responsible for the county jail.

5.     Defendant Christopher Perdue is a corrections officer with the jail. At all times relevant, he was in uniform and acting under color of state law.

## JURISDICTION AND VENUE

6.     The Court has jurisdiction because this action concerns state-law violations by Defendants, and the amount in controversy exceeds $15,000.

7.     The Court has personal jurisdiction over Defendants, who are located, work, and/or reside in Cuyahoga County. Venue is proper here because the events giving rise to Mr. Hipps's claims took place in Cuyahoga County.

## FACTUAL BACKGROUND

### Mr. Hipps establishes a prayer routine consistent with his Muslim faith.

8.     Tyrone Hipps, Jr. was booked into the county jail on June 22, 2018.

9.     Mr. Hipps is a practicing Muslim. At the time of his incarceration, he informed the jail officers that he is a Muslim and requested a no-pork diet.

10.    Despite their knowledge of his faith, County officials erected numerous needless barriers to the exercise of his Muslim faith, as they did for all inmates and detainees.

11.     Muslims observe *Jumu'ah*, a weekly congregational prayer that most Muslims are obligated to observe. Although the County allowed Christians to meet weekly for the Sabbath, it would not allow Mr. Hipps and other Muslims to meet for *Jumu'ah*.

12.     Muslims adhere to a *halal* diet, which prohibits the consumption of pork and certain other foods. The County's halal meals were undersized and did not provide detainees or inmates with adequate nutrition.

13.     Muslims need to observe *salat*, a series of five prayers offered to Allah at prescribed times throughout the day.

14.     The County would not allow clocks in the jail, so Mr. Hipps and other Muslims could not determine when they needed to pray.

15.     Muslims offer *salat* by bowing and prostrating towards the direction of Mecca, Saudi Arabia. Muslims believe that no person should stand, sit, lay, or walk directly in front of them while they pray.

16.     Despite the other barriers to his exercise of his faith, Mr. Hipps was able to offer *salat* at least five times a day. Because the area near his bed was open for people to walk past him, corrections officers had always permitted him to offer *salat* elsewhere. He did so in roughly the same spot every time—between one of three pairs of inmates' beds where a large box nearby ensured that no person walked in front of him, in accordance with his Islamic beliefs.

17.     At all times relevant, Mr. Hipps had permission from corrections officers to pray between the beds.

**Mr. Hipps reports abuse and corruption to the U.S. Marshals Service.**

18.     Beginning in late October and into early November 2018, investigators with the United States Marshals Service appeared at the county jail to assess jail conditions.

19.     On or about November 1, 2018, a team from the U.S. Marshals Service Quality Assurance Review Team came into Mr. Hipps's pod while conducting an audit of the jail operations.

20.     Mr. Hipps and several other inmates approached the team and began discussing problematic conditions, including unhygienic showers, overcrowding, unsafe food, inadequate medical care, and religious discrimination.

21.     Throughout the conversation, officers from the jail's Special Response Team ("SRT") were hovering over Mr. Hipps, talking over him, and disputing his allegations about jail conditions.

22.     Several minutes later, Mr. Hipps and two other inmates approached another member of the review team to discuss the SRT's use of excessive force and the inmates' fear that corrections officers would retaliate against them for cooperating with the audit.

23.     Later that day, the guard in charge of the pod warned Mr. Hipps to expect retaliation. He told Hipps that SRT members were "already hot about the marshals," and now they would come back to "fuck the block up."

**Perdue retaliates for Hipps's cooperation with the Marshals.**

24.     On November 3, 2018, Mr. Hipps began preparing to pray at the eastern end of his dormitory, as corrections officers normally permitted him to do.

25.     As an SRT member, Defendant Perdue was not assigned to a pod and was instead supposed to be on call for emergencies. Instead, he came to Mr. Hipps's pod. Within minutes, Defendant Perdue initiated a lockdown, one hour earlier than scheduled.

26.     Within seconds of ending the process for initiating the lockdown, Defendant Perdue approached Mr. Hipps.

27.     Although Mr. Hipps was routinely permitted to pray as he was doing at that moment, Defendant Perdue approached him and directed him to pray elsewhere. None of the new locations

to which Defendant Perdue directed him would allow Mr. Hipps to comply with his religious obligations.

28.     Requiring that Mr. Hipps offer *salat* in any of those locations would have required him to engage in conduct that seriously violates his religious beliefs.

29.     Inmates and detainees are subject to serious disciplinary action if they disobey a corrections officer's instructions, including instructions about where to pray.

30.     Defendant Perdue threatened to punish Mr. Hipps for failing to pray as Defendant Purdue instructed. Following the jail's routine procedure for addressing these types of concerns, Mr. Hipps asked Defendant Perdue to call a corporal to resolve the issue. Defendant Perdue left briefly, returned without a corporal, and threatened to move Mr. Hipps forcibly.

31.     Mr. Hipps complied with Defendant Perdue's command, picked up his prayer rug, and walked towards his bunk. He said: "This is my religion. I could sue you for this."

32.     Defendant Perdue responded: "I'll give you something to sue for." He grabbed Mr. Hipps and put him in a chokehold. He dragged Mr. Hipps to the front of the pod and slammed him headfirst onto the ground.

33.     Throughout these interactions, Defendant Perdue was wearing a camera. His body camera was in "Buffering Mode," where it is continuously recording. Footage recorded in Buffering Mode is automatically deleted unless the camera is switched to "Event Mode," which causes the camera to save anything it records going forward, as well as the footage from the 30 seconds before entering Event Mode.

34.     Defendant Perdue intentionally kept his camera in Buffering Mode to ensure it destroyed any footage of his attack on Mr. Hipps.

35.     Other inmates observed Defendant Perdue assault Mr. Hipps but were too intimidated to stop the attack. In a November 3 letter to the sheriff, 11 incarcerated citizens attested that the events

transpired as Mr. Hipps alleges: "Tyrone did not swing or fight back. He was following all commands. The S.R.T. waited till he was on his way to his bed to tackle him."

**The County escalates its retaliation, punishing Mr. Hipps for Perdue's attack, ignoring his grievances, and denying him medical care.**

36.     Despite having done nothing wrong, Mr. Hipps spent the next five days in "the hole," a disciplinary isolation unit. Cells in the hole are smaller and colder than in regular pods. Inmates and detainees there are also provided with less food and are cut off from access to phones, commissary, and contact with each other. They are permitted out of their cells only once a day for 20 minutes to shower, and sometimes even that limited time is not afforded to them.

37.     He remained in the hole for two days after a County investigator visited him and confirmed that video of the incident showed he had done nothing wrong. The investigator told Mr. Hipps he watched video of the events in question, saw that Mr. Hipps did not hit Defendant Perdue, and saw that Mr. Hipps had instead walked off. The County nonetheless left Mr. Hipps in the hole for several more days.

38.     Despite Defendant Perdue's assault on Mr. Hipps, jail administration did not place Defendant Perdue on leave or even separate him from Mr. Hipps. Defendant Perdue constantly taunted Mr. Hipps after his return from the hole, mocking him and using his hands to gesture at his throat.

39.     As a result of the incident, Mr. Hipps suffered injuries to his head, neck, legs, wrist, and hands that are expected to last into the foreseeable future. Mr. Hipps submitted multiple requests for medical care as a result of his injuries sustained in the attack. Defendant Cuyahoga County ignored his requests.

40.     Mr. Hipps submitted multiple complaints and grievances to the Cuyahoga County Sheriff's Department, as provided by the County's grievance policy. Defendants neither addressed nor acknowledged his grievances.

41.     The treatment Mr. Hipps endured is consistent with the jail's custom, policy, pattern, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

**Defendant Perdue falsely reports that Mr. Hipps attacked him.**

42.     In his initial incident report, Defendant Perdue falsely reported that Mr. Hipps struck him in the chest with his left shoulder, causing Perdue to use deadly force against Mr. Hipps. Downplaying his own role as aggressor, Perdue whitewashed his chokehold as "utilizing [his] left and right hand to escort the inmate," and described body slamming Mr. Hipps as an effort to "secure the inmate to the floor."

43.     In a November 10, 2018 investigatory interview, Defendant Perdue again falsely reported that Mr. Hipps struck him with his left shoulder. Contrary to video evidence, Defendant Perdue also stated he never applied pressure to Mr. Hipps's neck.

44.     In a statement dated November 15, 2018, Defendant Perdue again falsely reported that Mr. Hipps reacted with "extreme hostility" to his orders. Defendant Perdue also falsely reported that Mr. Hipps yelled, "NO FUCK IT N----! LET'S FIGHT," before striking Defendant Perdue in the chest with his shoulder.

45.     Defendant Perdue was wearing a camera that captured video recording of this interaction. He purposely allowed the camera to delete that footage.

46.     A report by Sergeant Leo Keglovic refutes Defendant Perdue's allegation. Video footage released by the County in response to public-records requests never shows Mr. Hipps demonstrating hostility toward Defendant Perdue. Mr. Hipps does not yell, strike, touch, threaten, threaten to touch, or even approach Defendant Perdue at any time before, during, or after the incident.

47.     Defendant Perdue's November 15, 2018 statement also falsely claims that Mr. Hipps resisted the chokehold by pulling away from and pushing back into Defendant Perdue. The County's video footage shows no evidence of such resistance.

48.     In a December 13, 2018 Request for Disciplinary Investigation, Assistant Warden Phillip Christopher indicated that his investigation did not support Defendant Perdue's version of events: "Recorded video surveillance did not capture OFC Perdue being struck by the inmate's shoulder; however as the inmate appeared to gather his belongings and walked closely by the officer, OFC Perdue then takes ahold of the inmate from behind and lifts the inmate off of the ground."

49.     As a result of the internal investigation, Egdilio Morales, the County's director of human resources, concluded that Defendant Perdue had violated rules prohibiting "unnecessary contact with a jail inmate" and had committed acts constituting "incompetency, inefficiency, dishonesty, immoral conduct, insubordination, discourteous treatment of the public, failure of good behavior or other misfeasance, malfeasance, or nonfeasance in office." As a penalty, Morales suspended Defendant Perdue for five days, beginning on March 17, 2019.

50.     Although the County purported to impose a "5 Day Unpaid Disciplinary Suspension," it ordered Defendant Perdue back to work on at 9:45 a.m. on March 20, 2019.

**The County refuses to produce complete surveillance video footage of the attack.**

51.     The County has motion-activated surveillance cameras throughout the jail.

52.     After word of Defendant Perdue's misconduct reached the public, media organizations and others—including Mr. Hipps—sought access to video footage of the attack under the Ohio Public Records Act, R.C. 149.43.

53.     The County has released surveillance video of only a portion of Defendant Perdue's attack on Mr. Hipps.

54.     Any and all videos captured on jail surveillance camera or body-worn camera of the attack on Mr. Hipps are public-records under Ohio's Public Records Act.

55.     The portion of the video that the County did produce is not complete and contains extensive gaps where motion is obviously occurring but the frame appears to be frozen.

56.     Although the cameras are motion-activated, the County maintains that there is no video of the time when Defendant Perdue claims that Mr. Hipps acted with "extreme hostility," shouted, "rose from a crouched position," and "struck [him] in [his] chest with his shoulder."

57.     Although the cameras are motion activated, the County maintains that there is no video of the time when Defendant Perdue claims that he "[placed his] left and right hands on the inmates back to begin securing the inmate."

58.     The County permitted Defendant Perdue the discretion to determine whether to record audio and video of the interaction with Mr. Hipps.

59.     On information and belief, corrections personnel at the jail regularly fail to activate their body-worn cameras, preventing the preservation of audio and video evidence of their interactions with inmates. The County generally does nothing to address or curtail these rampant violations of its written policy.

60.     The failure to preserve complete video evidence of Mr. Hipps's abuse is consistent with the jail's custom, policy, pattern, and practice of destroying public records documenting the abuse corrections staff inflict at the jail.

**Other incidents resulting from the malicious, bad-faith, wanton, and reckless exercise of discretion at the county jail.**

61.     In addition to the above-described treatment of Mr. Hipps, other corrections staff, as part of a custom, policy, pattern, and practice, have perpetrated many additional unprovoked and unwarranted acts of violence on the people incarcerated in the jail along with other constitutional-rights violations. Some of those acts are described in the following paragraphs.

62.     Also detailed are various instances where the County has failed to maintain complete and accurate public records documenting the abuse perpetrated by corrections staff through destruction of or tampering with videos depicting abuse.

**A corrections officer attacked Lucille Dumas while she was confined to a restraint chair, breaking a Tupperware container over her head.**

63.     On January 14, 2015, Lucille Dumas was booked into the Euclid Jail—then operated by Defendant Cuyahoga County—after a traffic stop. During the booking process, Corporal Madeline Chappell punched Ms. Dumas in the face.

64.     When Ms. Dumas stood up to take a defensive posture, several officers threw her to the ground. One of the officers kicked her while she was on the ground, and Chappell sprayed her with pepper spray. An officer then lifted Ms. Dumas off the floor by her hair and threw her into a restraint chair.

65.     After the officers strapped Ms. Dumas into the chair, Corporal Chappell fixed her own hair and then began punching Ms. Dumas in the face. Another officer rolled Ms. Dumas into an area out of sight of surveillance cameras, where Chappell beat her with a Tupperware container, using enough force to shatter the container.

66.     Corporal Chappell ordered officers to throw away evidence of her attack, delete information from their reports of the incident, and sign false statements about what happened.

67.     Corporal Chappell had already been disciplined dozens of times before this attack. She was only able to carry out her attack on Ms. Dumas because the County failed to properly discipline her for unprofessional conduct.

68.     The treatment Ms. Dumas endured is consistent with the jail's custom, policy, pattern, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

### A corrections officer smashed Joshua Castleberry's teeth into his nose over a dispute about a bologna sandwich.

69.     On February 5, 2018, Joshua Castleberry was in the county jail. Following a dispute over a bologna sandwich, officer John Wilson smashed the face of a handcuffed Mr. Castleberry into the floor so violently that his teeth were broken (with one tooth pushed all the way up into his nasal cavity). At least one other officer—Corporal Brandon Honaker—witnessed this attack but did not report it to law enforcement. Corrections staff placed Mr. Castleberry in a restraint chair and jammed a mask over his broken face to conceal the assault from medical staff.

70.     At the time, Ken Mills was the administrator of the jail. (Mills has since resigned and been indicted based on his jail-related misconduct.) His officers refused to let nursing staff remove the mask to assess Mr. Castleberry's injuries, but a night nurse saw Mr. Castleberry and requested medical evaluation. The security supervisor refused, saying: "He wants to try and hit one of my officers — he can sit the fuck there for hours."

71.     The night nurse called the nursing supervisor, Gary Brack, R.N., at home, reporting a serious medical emergency. Nurse Brack called the staff sergeant in charge and demanded a medical evaluation, but the Defendant County waited another half-hour before transporting Mr. Castleberry to medical. The mask was lifted, EMS was called, and Mr. Castleberry was transported to the hospital for surgery to remove the tooth from his nasal cavity and to reconstruct his face.

72.     The next day at the monthly sheriff's meeting, Mills covered up the abuse. When asked about the incident, Mills stated: "I reviewed the situation and the officers used appropriate force to the threat of what the incarcerated citizen was using." Medical Director Dr. Thomas Tallman asked to view the security footage, but Mills refused, saying: "I already reviewed it — nothing was done wrong." (At County Executive Armond Budish's insistence, MetroHealth removed Nurse Brack from his position and constructively discharged him for blowing the whistle on jail conditions to the County Council. Dr. Tallman has since been removed as the jail's medical director.)

73.     Former Sheriff Clifford Pinkney stated that he would follow up with the incident, but when he went to review the footage, the security and body-camera footage had supposedly "disappeared."

74.     Wilson was indicted for felonious assault in the second degree and misdemeanor charges of interfering with civil rights and unlawful restraint. Corporal Jason Jozwiak was charged with unlawful restraint and interfering with civil rights related to denying Mr. Castleberry medical care. Although Jozwiak was acquitted, the result was a hung jury on the charges against Wilson for felonious assault and interfering with civil rights. The Ohio Attorney General's Office has announced that it will retry Wilson.

75.     During the trial, FBI agent Dennis Timony testified that his investigation revealed evidence that jail videos had been deleted. That explains why there was no video of Wilson attacking Castleberry for the sheriff to review or the jury in the criminal case to see. And it reveals serious flaws in the County's security and records-management protocols.

76.     The County held no one accountable for what happened to Mr. Castleberry.

77.     The treatment Mr. Castleberry endured is consistent with the jail's custom, policy, pattern, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

78.     The failure to preserve the video evidence of this abuse is consistent with the jail's custom, policy, pattern, and practice of destroying public records documenting the abuse corrections staff are perpetrating at the jail.

**Corrections officers confined Chantelle Glass to a restraint chair and emptied
a can of pepper spray in her face.**

79.     Chantelle Glass was booked into the county jail on July 16, 2018 after police discovered a warrant stemming from an outstanding traffic ticket.

80.     Ms. Glass requested a phone call so she could inform her family of her arrest, and contact an attorney. The guards repeatedly refused Ms. Glass's request.

81.     When Ms. Glass persisted in her request after being placed in a holding cell, corrections officers threatened that if she did not stop, they would tie her down and "mace" her. Ms. Glass continued to request her phone call, and officers called Corporal Idris-Farid Clark, a supervisory officer.

82.     Corrections officer Robert Marsh retrieved a restraint chair. Video surveillance shows Clark remove his can of pepper spray from his tactical vest, shake it, and return it to his vest pocket before Ms. Glass was even brought out of her cell.

83.     Ms. Glass cooperated as officers escorted her out of her cell in handcuffs, and strapped her into a restraint chair. As Marsh continued tightening the restraints, Clark again took out his pepper spray and again shook the canister.

84.     When Marsh reached between Ms. Glass's knees, she instinctually drew her legs together out of fear. She made no other movements. Ms. Glass—strapped into the restraint chair—could not pose any threat to the officers.

85.     Rather than step back when Ms. Glass flinched, Marsh stepped in and punched her in the head. She flailed in her restraints, trying in vain to protect herself.

86.     Corporal Clark than stepped up to make good on his colleague's threat to "mace" Ms. Glass. He emptied an entire canister of pepper spray onto Ms. Glass's face. Ms. Glass tried to turn her head to avoid the spray, but Clark grabbed her hair to hold her head still while deploying the pepper spray inches from her eyes.

87.     When the attack concluded, Ms. Glass asked Clark: "Why did you mace me?" He responded: "Because you talk too much." (Video of this exchange was not retained by Clark's body-worn camera because he chose to leave it in Buffering Mode and allow it to erase any record of the interaction.)

88.     Rather than providing Ms. Glass with prompt and adequate medical care, the officers wheeled her to a utility closet. Minutes passed before officers began "decontamination" by thrice spritzing Ms. Glass's face and the top of her head with water. This did not effectively decontaminate Ms. Glass (nor was it intended to do so). Pepper spray still covered her face, neck, and chest after the "decontamination" concluded.

89.     Clark then wheeled Ms. Glass to the medical unit. Having access to medical personnel did not improve matters, given the medical staff's participation in the corrections officers' deliberate indifference to and apparent enjoyment of Ms. Glass's agony. The sole "medical care" provided by Nurse Diane Lessmann was dabbing Ms. Glass's eyes with gauze. This nurse did not explain to Ms. Glass what was happening to her or display any compassion for her pain.

90.     When Ms. Glass left the medical unit, pepper spray was still visible on her face, neck, and chest. Ms. Glass was placed alone in an isolation cell still restrained and covered in pepper spray for over two hours, and denied access to food, water, and the opportunity to use the restroom facilities.

91.     For her entire 48-hour stay in the jail, corrections staff denied Ms. Glass's requests to shower.

92.     For her entire 48-hour stay in the jail, Ms. Glass remained in the same clothing contaminated with pepper spray and urine.

93.     Ms. Glass was released on July 18, 2018, after New Jersey officials confirmed that they did not want her extradited on the old warrant.

94.     Under the Ohio Public Records Act, Ms. Glass requested video records of her time the jail, but the County has not provided all the footage it created.

95.     Clark was indicted on April 8, 2019. He was charged with felonious assault, interfering with civil rights, and unlawful restraint, all in connection with his treatment of Ms. Glass. Clark was indicted again on August 28, 2019. He was charged with two counts of extortion and one count of

intimidation in connection with his attempts to force a co-worker into testifying for him, using "bootleg" copies of videos showing other guards engaging in conduct that he believed was even worse than his own. He was indicted a third time on October 23, 2019—for tampering with records and unauthorized use of computer, cable, or telecommunications property—after a search of his property uncovered the "bootleg" jail videos.

96.     The treatment Ms. Glass endured is consistent with the jail's custom, policy, pattern, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

97.     The failure to meaningfully discipline Clark for failing to record and preserve his interactions with Ms. Glass is part of a custom, policy, pattern, or practice that led to Defendant Perdue's attack on Mr. Hipps and his destruction of evidence related to it.

98.     The failure to preserve the video evidence of this abuse is consistent with the jail's custom, policy, pattern, and practice of destroying public records documenting the abuse corrections staff are perpetrating at the jail.

**Corrections officers left Blanche Hill in a restraint chair for 12 hours.**

99.     Blanche Hill was booked into the jail in July 2018.

100.    Without any legitimate reason to do so, jail staff forced Ms. Hill into a restraint chair for many hours and denied her food, water, and the opportunity to use the restroom facilities.

101.    The County held no one accountable.

102.    Under the Ohio Public Records Act, Ms. Hill requested video records of her time at the jail, including officers forcing her into the restraint chair, but the County has not produced it.

103.    The treatment Ms. Hill endured is consistent with the jail's custom, policy, pattern, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

104.     The failure to preserve the video evidence of this abuse is consistent with the jail's custom,

policy, pattern, and practice of destroying public records documenting the abuse corrections staff

are perpetrating at the jail.

**A corrections officer attacked Corrionne Lawrence without provocation;**
**another threatened to kill him and "make it look like a suicide."**

105.     On September 16, 2018, Corrionne Lawrence was booked into the jail. He spent

approximately four hours confined in a restraint chair as a punishment for speaking Spanish during

the booking process. The responsible corrections officer failed to prepare and submit the required

report documenting this use of the restraint chair.

106.     Before being assigned to a pod, Mr. Lawrence alerted corrections staff that he had to be kept

separate from Stacy Norris, who was in the jail on charges that he murdered Mr. Lawrence's cousin.

107.     Though initially housing them separately, the jail relocated Mr. Lawrence to Mr. Norris's pod

approximately one month later. Mr. Norris threatened Mr. Lawrence in the presence of corrections

officers. Corrections staff then allowed Mr. Norris to attack Mr. Lawrence in his cell.

108.     Mr. Lawrence sustained no visible injuries in the Norris attack, but was taken to medical per

protocol and released.

109.     While Corporal Christopher Little escorted a handcuffed Mr. Lawrence from the infirmary

to his new cell in disciplinary isolation, Little told Mr. Lawrence to step to the back of the elevator

and face the wall. Mr. Lawrence complied, and Little stated: "Let's play a game." Little then

repeatedly punched Mr. Lawrence in the side of his face, punched and kicked him while he was on

the floor, called him a "n****r," and threatened him if he did not keep his mouth shut.

110.     Mr. Lawrence asked another employee, Brandon Smith, if he could go to the nurse and

Smith laughed in Mr. Lawrence's face.

111.     While still in isolation, a corrections officer threatened to mace Mr. Lawrence and told him

"N**** I will kill you, hang you, and make it look like a suicide" when Mr. Lawrence asked for a

shower. Over the past year, at least nine people incarcerated in the jail died, including as a result of apparent suicide by hanging.

112.     Mr. Lawrence spent 12 days in isolation. Mr. Lawrence was interviewed repeatedly by the United States Marshals Service. During his interview, Mr. Lawrence revealed to the Marshals that Little had assaulted and threatened him.

113.     Smith escorted Mr. Lawrence from the interview and said: "Why you snitching? You a snitch now. Trying to get my boy indicted."

114.     The Marshals Service eventually demanded that the County transfer Mr. Lawrence and others out of the jail given the threats by SRT staff. Mr. Lawrence was taken to Geauga County jail for his own protection.

115.     The County held no one accountable for the attack on Mr. Lawrence, for the threats on his life, or for failing to record their interactions with him.

### Jail staff moved Joseph Sawyer from his wheelchair into a restraint chair, beat him, and pepper-sprayed him for no reason.

116.     In October 2018, Joseph Sawyer was booked into the jail. Mr. Sawyer is confined to a wheelchair due to a degenerative bone condition. Without any legitimate reason to do so, Brandon Smith—the same officer who refused to let Mr. Lawrence see a nurse—punched Mr. Sawyer in the face, pepper sprayed him, and strapped him into a restraint chair.

117.     Jail staff failed to effectively decontaminate Mr. Sawyer from the pepper spray and refused to permit him to shower or change clothes for more than a week. Jail staff also denied him the use of a wheelchair.

118.     The County held no one accountable.

119.     Mr. Sawyer asked the County to provide the video of his time in the jail, including the attack he endured, but the County has not provided any.

120.    The treatment Mr. Sawyer endured is consistent with the jail's custom, policy, pattern, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

121.    The failure to preserve the video evidence of this abuse is consistent with the jail's custom, policy, pattern, and practice of destroying public records documenting the abuse corrections staff are perpetrating at the jail.

### A corrections officer violently shoved Timothy Bennett while he was receiving an injection from medical staff.

122.    On approximately November 1, 2018, corrections officer Brandon Smith attacked Timothy Bennett as he was receiving an injection from medical staff at the diabetic cart, pushing Bennett while the needle was inserted in his back.

123.    On information and belief, Smith was actually written up for this violent outburst. Compared with the many, many times that corrections staff imposed punitive violence with no consequence, the isolated write up of Smith was an anomaly.

124.    On information and belief, this stray instance of showing mild displeasure at an SRT officer hurting someone in custody was motivated by either the presence of medical staff during the incident or the ongoing federal investigation about which Smith was furious.

125.    The jail's own investigation into Smith's use of force against Bennett confirmed that just before Smith put his hands on Bennett at the diabetic cart that morning, Smith had called Bennett a "snitch" for speaking to federal investigators about jail conditions. Jail nurse Gwendolyn Bremer confirmed that Smith called Bennett a "snitch."

126.    The treatment Mr. Bennett endured is consistent with the jail's custom, policy, pattern, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

**Corrections officer Charles Enoch attacked an inmate and put him in a restraint chair for singing.**

127.    In November 2018, corrections officer Charles Enoch used excessive and entirely unnecessary force against an inmate, pushing and punching him before putting him in a chokehold and finally into a restraint chair. The inmate suffered a broken wrist. Enoch attacked the inmate because he had been singing.

128.    The treatment this individual endured is consistent with the jail's custom, policy, pattern, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

**Jail staff restrained, beat, and pepper sprayed Antoine Blackshear without legitimate reason to do so.**

129.    In December 2018, without any legitimate reason to do so, jail staff confined Antoine Blackshear to a restraint chair, beat him, and pepper sprayed him.

130.    Jail staff failed to adequately decontaminate Mr. Blackshear before releasing him.

131.    The County held no one accountable.

132.    Mr. Blackshear requested video of the attack, noting the specific time date, and cell where it happened, but the County claims it has no such records.

133.    The treatment Mr. Blackshear endured is consistent with the jail's custom, policy, pattern, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

134.    The failure to preserve the video evidence of this abuse is consistent with the jail's custom, policy, pattern, and practice of destroying public records documenting the abuse corrections staff are perpetrating at the jail.

**A corrections officer pepper sprayed and restrained Margaret Jackintell for objecting to his verbal abuse of other inmates.**

135.    Margaret Jackintell is a 57-year old Navy veteran. She was booked into the county jail in December 2018.

136.    While incarcerated, she observed a corrections officer verbally abusing other incarcerated women. She voiced her disagreement at the way he was addressing them. Corrections staff responded savagely, tackling her to the ground and triggering an anxiety attack. A guard saturated her with pepper spray before strapping her into a restraint chair.

137.    Jail staff left Ms. Jackintell in the restraint chair, covered in pepper spray, for approximately 12 hours. During that time she was denied food, water, or the opportunity to use the restroom facilities.

138.    For days after she was released from the chair, corrections staff refused to allow her to shower or clean herself.

139.    After she endured this abuse, a supervisor named Bitterman repeatedly came to her cell to taunt her saying, e.g., "You're no fucking kind of veteran, you fucking bitch! I don't believe you're a veteran."

140.    The County held no one accountable.

141.    Ms. Jackintell asked the County to provide the video of the attack, but the County has provided nothing.

142.    The treatment Ms. Jackintell endured is consistent with the jail's custom, policy, pattern, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

143.    The failure to preserve the video evidence of this abuse is consistent with the jail's custom, policy, pattern, and practice of destroying public records documenting the abuse corrections staff are perpetrating at the jail.

**Corrections officers emptied a can of pepper foam into Daniel Ford, Jr.'s face and rubbed it into his eyes.**

144.    In December 2018, Daniel Ford, Jr. was booked into the jail. Ford suffers from post-traumatic stress disorder. Corrections staff refused to provide his mental-health medication.

145.    Mr. Ford was attacked by another inmate and put into administrative segregation.

146.    Corrections officers took his clothes and left him in a cell with blood, feces, and urine in it, with no bedding. When Mr. Ford begged corrections officers to let him clean the cell or give him a blanket, they refused.

147.    Mr. Ford began yelling to get the attention of anyone who could address the conditions he had been left in. Staff eventually brought Ford clothing. But they confined him to a restraint chair and emptied a can of pepper spray in his face.

148.    After emptying an entire can of pepper spray in his face, one of the corrections officers literally rubbed it in, using his gloves to smear the pepper spray around Ford's face and into his eyes.

149.    Corrections staff did not properly decontaminate Ford, leaving him covered in pepper-spray residue.

150.    The treatment Mr. Ford endured is consistent with the jail's custom, policy, pattern, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

151.    Mr. Ford has requested video records of his mistreatment under the Ohio Public Records Act, but the County has not provided any of it.

**Corrections officers beat Terrence Debose while he was strapped into a restraint chair.**

152.    On March 22, 2019, a corrections officer strapped Terrence Debose in a restraint chair in a small cell. Mr. Debose suffers from mental illness.

153.    While Mr. Debose was restrained, Corporal Nicholas Evans turned off his body-worn camera and repeatedly punched Mr. Debose in the face. Another corrections officer, Timothy Dugan, entered the room and joined in the abuse, punching Mr. Debose twice in the face.

154.    As a result of the attack, Mr. Debose suffered a concussion.

155.    Evans was convicted of attempted felonious assault and tampering with evidence. Dugan was convicted of misdemeanor assault and attempted abduction.

156.    Despite the indictments and convictions, the County has taken no disciplinary action against anyone for the attack on Mr. Debose.

157.    The treatment this Mr. Debose endured is consistent with the jail's custom, policy, pattern, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

158.    Evans turned off his camera because the County has a custom, policy, pattern and practice that permits—and in some cases orders—corrections officers to turn their cameras on and off as they prefer, capturing evidence they want and destroying evidence they do not without fear of discipline.

159.    Kenneth Mills, then the director of the jail, has been charged with crimes stemming from attempts to cover up the crimes and unsafe conditions occurring at the jail. He was indicted January 18, 2019 on charges of tampering with records, telecommunications fraud, four counts of falsification and two counts of obstructing official business. On October 23, 2019, he was indicted on additional charges: two counts of dereliction of duty for "making the jail unsafe."

160.    Eric Ivey, the former warden of the jail, was indicted on April 18, 2019. He was charged with tampering with evidence and falsification, with both charges stemming from his handling of the death of an inmate at the jail. After a plea bargain, he was convicted of obstructing official business and falsification, and agreed to cooperate with prosecutors.

161.     On information and belief, there are incidents of excessive force and abuse by corrections

officers—including retaliatory and punitive use of force, restraints, and pepper spray—in addition to

those listed above.

### CLAIM 1
### FOURTEENTH AMENDMENT VIOLATION UNDER 42 U.S.C. § 1983 FOR A CUSTOM, POLICY, PATTERN, OR PRACTICE TOLERATING THE USE OF EXCESSIVE FORCE (AGAINST CUYAHOGA COUNTY)

162.     Plaintiff incorporates all previous allegations.

163.     Defendant Cuyahoga County permits, tolerates, and is deliberately indifferent to a pattern

and practice of excessive force by its corrections officers at the jail. This widespread tolerance of

excessive force by corrections officers constitutes a county policy, practice, pattern, or custom, and

led to Mr. Hipps being attacked by Defendant Perdue.

164.     Defendant Perdue and his coworkers' behavior is part of a recurring pattern of excessive

force used on the people in custody at the county jail.

165.     Corrections personnel failed to take basic, appropriate steps to protect Mr. Hipps from

violence or to intervene when he was subjected to it.

166.     Cuyahoga County's customs, policies, patterns, and practices have created a toxic culture

that has desensitized its corrections personnel to brutal, sadistic violence at the jail because that

violence is something wholly unremarkable. Corrections officers' savage and casual resort to

violence is an ordinary aspect of jail culture that those incarcerated have learned to expect and that

those responsible for overseeing the jail staff have fostered and tolerated.

167.     Based on previous instances of unjustified use of excessive force (some of which are

described above), Defendant Cuyahoga County had notice of a pattern of constitutionally offensive

acts by its corrections officers but failed to take any remedial steps in response to the notice.

168.     The culture of the punitive violence cultivated at the county jail was apparent to federal

investigators who assessed the facility last year.

169.    According to the Quality Assurance Review of the Cuyahoga County Corrections Center,

the United States Marshals Service found the following deficiencies related to use of force:

a.      "Review of Use of Force (UOF) incidents determined staff are not utilizing all tools

and techniques generally accepted as best practices for UOF teams to ensure staff and

detainee safety (i.e., confrontation avoidance, UOF team concept, team briefings and

debriefings, removing staff involved at the on-set of the incident from the immediate area,

and a review of all UOF incidents by the agency administrator or designee, and medical

assessment of all involved). Additionally, video tapes involving UOF are not tagged and

labeled as evidence. Written reports are not required from all persons involved in the use of

force or any staff who played a role in the incident (i.e., medical, correctional personnel,

SRT, etc.)." *Id.* at 35.

b.      "Over 100 detainee/inmate interviews reveal strong and consistent allegation of

brutality, UOF punishment, and cruel treatment at the hands of Security Response Team

(SRT), whom the detainee/inmates refer to as "The Men in Black," based on their black

para-military uniforms." *Id.*'

c.      "During the review, review team members observed SRT members verbally abusing

and demonstrating aggressive behavior towards detainees/inmates; review of multiple UOF

and SRT body-cam video reveal and contain aggressive conduct and behavior as well as

abusive, explicit language used by SRT members directed at detainees/inmates." *Id.*

d.      "SRT members who were escorting detainee/inmates to be interviewed by Facility

Review Team members were referring to requested detainee/inmates as "Snitches," as they

escorted them to and from the interview location. The threatening, intimidating and

aggressive behavior demonstrated and witnessed by the Facility Review Team resulted in the

request to remove up to 10 detainee/inmates from the CCCC, for fear of SRT members retaliation, and the legitimate fear of detainee/inmate safety." *Id.*

170.    By permitting, tolerating, and sanctioning a persistent and widespread policy, practice, pattern, and custom of corrections officers using excessive force against people in custody—under which Mr. Hipps was victimized—Defendant Cuyahoga County deprived Mr. Hipps of rights, remedies, privileges, and immunities guaranteed to every citizen of the United States.

171.    In addition to the constant threat of punitive violence, Cuyahoga County's incarcerated population also lives with deplorable conditions including acute overcrowding, lack of medical care, inadequate nutrition and hygiene, vermin infestations, and a cascade of other horrific conditions. The jail is a crucible of misery of which the County has been on notice and fully aware for years. In a move calculated to inflict unnecessary suffering on the incarcerated population, jail administration deliberately moved medical screenings from the intake area to avoid having medical personnel observe and evaluate new arrivals in need of medical care including mental-health and substance-abuse treatment. Despite its obligation to maintain minimum standards under Ohio Administrative Code Chapter 5120:1-8 and the Federal Performance-Based Detention Standards of the United States Department of Justice, the County allowed the jail to devolve into abject squalor.

172.    In November 2018, a number of county judges wrote to jail administration about poor conditions in the jail. One judge said, "The County's indifference to the dangers created by failing to meet the needs of a very fragile and volatile prison population must end." Others blasted the woefully inadequate medical care.

173.    The County's deliberate indifference to the needs of its inmate population and the conditions under which they are forced to survive led directly to the deaths of nine inmates: on June 10, 2018, Theodore Carter died at the jail from complications from cancer; on June 26, 2018, Esteban Parra died at the jail from an overdose; on July 3, 2018, Larry Johnson died at the jail from

apparent suicide; on August 28, 2018, Jose Arquillo died at the jail from an overdose (former warden Eric Ivey would later be charged and plead guilty to charges stemming from his direction to a corrections officer to turn off his body camera during this incident); on August 30, 2018, Gregory Fox died at the jail from apparent suicide; on August 31, 2018, Randall Rain died at the jail from apparent suicide; on October 2, 2018, Allen Gomez Roman died at the jail from apparent suicide; on December 30, 2018, Brenden Kiekisz died at the jail from apparent suicide; and on May 10, 2019, Nicholas Colbert died at the jail from apparent suicide.

174.     Despite its awareness of the overcrowding, understaffing, lack of adequate medical care, use of excessive force, destruction of video evidence, and other misconduct at the jail, Defendant Cuyahoga County has refused to mitigate this disaster.

175.     Conditions at the jail remain so atrocious to this day that the corrections officers recently filed to begin the process of changing the union that will represent them in negotiations with the County. In September 2019, the corrections officers filed with the state to change their union from the Ohio Patrolmen's Benevolent Association to the Fraternal Order of Police. The officers cited involuntary overtime and unsafe working conditions (such as double- and quadruple-podding, and leaving a single officer in charge of 100–200 inmates at a time) as some of the concerns prompting the change in their bargaining representative.

176.     The State of Ohio Department of Rehabilitation and Correction has also found serious deficiencies with the jail's conditions. Two separate inspections in 2019 revealed a combined 150 violations of state standards.

177.     This year, specially appointed assistant Ohio attorneys general have indicted numerous current or former jail employees including the former director of regional corrections, the former warden, supervisor corrections officers, and line corrections officers.

178.    Defendant Cuyahoga County tolerated and failed to prevent the incidents of excessive force against numerous incarcerated citizens including, but not limited to, Corrionne Lawrence, Glenn Mayer, Jr., Joshua Castleberry, Terrence Debose, Chantelle Glass, Blanche Hill, Antoine Blackshear, Joseph Sawyer, Margaret Jackintell, Timothy Bennett, Daniel Ford, Jr., and others.

179.    As a direct and proximate result of the Defendant County's unlawful conduct, Mr. Hipps suffered and will continue to suffer economic and non-economic damages for which this Defendant is liable, including, but not limited to, mental, emotional, and physical pain and suffering.

### CLAIM 2
### FOURTEENTH AMENDMENT VIOLATION UNDER 42 U.S.C. § 1983 FOR DELIBERATE INDIFFERENCE/FAILURE TO TRAIN AND SUPERVISE CORRECTIONS OFFICERS (AGAINST CUYAHOGA COUNTY)

180.    Plaintiff incorporates all previous allegations.

181.    Defendant Cuyahoga County permits, tolerates, and is deliberately indifferent to its failure to train and supervise corrections officers on how to interact with people in custody, including using force appropriately in a correctional setting.

182.    Defendant Cuyahoga County failed to train and supervise its corrections officers on how to use the best use-of-force tactics to ensure the safety of incarcerated citizens. The behavior of Defendant Perdue is consistent with a recurring pattern of how corrections officers interact with people in custody at the jail, due to a lack of training and accountability and a general tolerance for ignoring the humanity of the human beings in the jail and refusing to treat their medical conditions appropriately.

183.    Defendant Cuyahoga County had notice of its failure to train and supervise its corrections personnel, which resulted in a pattern of constitutionally offensive acts by its corrections officers. Defendant Cuyahoga County failed to take any remedial steps in response to the notice. The County allowed Defendant Perdue to attack Mr. Hipps while he was trying to pray.

184.    Defendant Perdue behaved this way because it was consistent with Defendant Cuyahoga County's culture of violence and abuse against the people detained in its jail.

185.    The County also knew that its chronic failure to adequately staff the jail while continuously marketing itself to take in more and more population from Cleveland and the surrounding communities would lead to predictable disaster. Yet it failed to take basic steps to mitigate the disaster it created.

186.    On information and belief, Defendant Cuyahoga County has, despite notice, tolerated and nurtured its corrections officers' violent and abusive conduct by failing to intervene and prevent abuse. The County was deliberately indifferent to the obligation to train corrections officers on how to behave.

187.    For example, Defendant Cuyahoga County tolerated and failed to prevent the incidents of excessive force against numerous incarcerated citizens including, but not limited to, Corrionne Lawrence, Glenn Mayer, Jr., Joshua Castleberry, Terrence Debose, Chantelle Glass, Blanche Hill, Antoine Blackshear, Joseph Sawyer, Margaret Jackintell, Timothy Bennett, Daniel Ford, Jr., and others.

188.    According to the Quality Assurance Review of the Cuyahoga County Corrections Center, the United States Marshals Service found the following training deficiencies:

a.      "Denial of detainees/inmates to perform hygiene, detainees/inmates are not allowed access to showers, telephones and recreation due to CCCC's implementation of a lockdown system known as "Red Zone." The "Red Zone" RHU detainees/inmates management system is used as a means to address insufficient staff and staffing shortages. Detainees/inmates housed in the "Red Zone" RHU are locked down for periods of 27 or more hours in their cells, additionally interviews with detainees/inmates in the "Red Zone"

RHU are lockdown, along with inspection of their cells reveal the absence of toothbrushes, toothpaste, toilet paper and denied access to razors or barbering." *Id.* at 4.

b.     "There is no internal quality control plan in place to provide an annual review of CCCC's operations to ensure compliance to ensure compliance with CCCC's policies and procedures. CCCC is inspected annually by the Ohio Department of Rehabilitation and Corrections' Bureau of Adult Detention to determine compliance with the Ohio's Minimum Standards for Adult Detention Centers. The last inspection was on November 14, 2017; review of the November 14, 2017 previous inspection documentation reveal CCCC's staff did not comply, address or provide corrective actions for identified deficiencies which included: exceeding rated capacity, lack of natural lighting in housing units, and detainees/inmates not being provided with five hours a week of exercise. A corrective action plan to address the aforementioned identified deficiencies was not provided for review." *Id.* at 26.

c.     "Sheriff's Deputies provide transportation and outside escort for detainees/inmates. Therefore, Correctional Officers do not carry firearms, nor do they receive specialized firearms training. Staff authorized to use chemical agents receive required training. A review of management and supervisory staff training files reveal management and supervisory staff receive 40 hours of management and supervisory training during their first year and only 8 hours annually as required by the Ohio Minimum Adult Detention Standards. FPBDS requires management and supervisory staff receive an initial 40 hours training the first year and 24 hours thereafter." *Id.* at 28-29.

d.     "There is no policy in place requiring notification to the agency of jurisdiction of serious incidents involving detainees/inmates. Additionally, no documentation was provided for review to support the practice of external agency notifications." *Id.* at 29.

e.      "Interview with staff reveal numerous staff at all levels express concerns for their

safety and security due to staffing shortages; concerns were also expressed regarding morale

and sense of inability to make changes or voice concerns to leadership or management." *Id.*

at 29.

189.    By permitting, tolerating, and sanctioning a persistent and widespread custom, policy,

pattern, and practice of deliberate indifference to failing to train and supervise corrections officers

not to use excessive force, Defendant Cuyahoga County deprived Mr. Hipps of rights, remedies,

privileges, and immunities guaranteed to every citizen of the United States.

190.    By permitting, tolerating, and sanctioning a persistent and widespread custom, policy,

pattern, and practice of deliberate indifference to failing to provide medical care to people in

distress, Defendant Cuyahoga County deprived Mr. Hipps of rights, remedies, privileges, and

immunities guaranteed to every citizen of the United States.

191.    By permitting, tolerating, and sanctioning a persistent and widespread custom, policy,

pattern, and practice of deliberate indifference to failing to permit access to showers and food,

Defendant Cuyahoga County deprived Mr. Hipps of rights, remedies, privileges, and immunities

guaranteed to every citizen of the United States.

192.    By permitting, tolerating, and sanctioning a persistent and widespread custom, policy,

pattern, and practice of deliberate indifference to failing to generally follow its written policies rather

than its actual abusive customs, policies, patterns, and practices, Defendant Cuyahoga County

deprived Mr. Hipps of rights, remedies, privileges, and immunities guaranteed to every citizen of the

United States.

193.    As a direct and proximate result of Defendant Cuyahoga County's unlawful conduct, Mr.

Hipps suffered and will continue to suffer economic and non-economic damages for which this

Defendant is liable, including, but not limited to, mental, emotional, and physical pain and suffering.

## CLAIM 3
## FIRST AND FOURTEENTH AMENDMENT RETALIATION UNDER 42 U.S.C. § 1983
### (AGAINST BOTH DEFENDANTS)

194.    Mr. Hipps incorporates all previous allegations.

195.    Defendant Cuyahoga County created a custom, policy, pattern, and practice of permitting

retaliation against incarcerated citizens for speaking out about abuse or corruption in the jail,

including permitting retaliation against the individuals who were cooperating with the federal

investigation into jail conditions.

196.    As part of the jail's entrenched snitching-abatement protocol—which was in full effect well

before the federal marshals appeared in late October 2018—staff engaged in verbal and physical

abuse of incarcerated men and women for speaking out on matters of public concern in the jail.

197.    When corrections staff learned of the federal investigation into jail conditions, the staff made

no effort to hide their anger at those cooperating. The retaliatory climate was instant and obvious to

both rank-and-file and supervisory employees.

198.    Defendant Cuyahoga County took no steps to address or remedy the retaliation SRT officers

were dishing out until Chief Anderson from the Marshals Service complained to Sheriff Pinkney.

Only once it was clear that the federal government knew about the SRT officers' retaliation the

County take any steps to address it, and then only took steps to protect a handful of inmates by

relocating them outside Cuyahoga County. The County did absolutely nothing to hold the retaliators

accountable, thereby sending a powerful message regarding its continuing tolerance for staff abuses.

199.    Defendant Perdue attacked Mr. Hipps in retaliation for Mr. Hipps's cooperation with the

U.S. Marshals Service.

200.    This continuation of retaliation demonstrates that Defendant Perdue's response was

consistent with the County's custom, policy, pattern, and practice that created the corrupt and

abusive conditions in the first place.

201.    As a direct and proximate result of Defendants' unlawful conduct, Mr. Hipps suffered and will continue to suffer economic and non-economic damages for which this Defendant is liable, including, but not limited to, mental, emotional, and physical pain and suffering.

### CLAIM 4
### FOURTEENTH AMENDMENT USE OF EXCESSIVE FORCE UNDER 42 U.S.C. § 1983 (AGAINST DEFENDANT PERDUE)

202.    Plaintiff incorporates all previous allegations.

203.    Defendant Perdue purposefully and knowingly used objectively unreasonable force against Mr. Hipps. The above-described use of force was unnecessary, gratuitous, and objectively unreasonable.

204.    All the facts and circumstances surrounding this incident cannot be viewed subjectively or objectively to support any use of force, let alone the extreme level of force Defendant Perdue used.

205.    As a direct and proximate result of Defendant Perdue's unlawful and sadistic conduct, Mr. Hipps suffered and will continue to suffer economic and non-economic damages for which this Defendant is liable, including, but not limited to, mental, emotional, and physical pain and suffering.

206.    Defendant Perdue's acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter him and others from engaging in this type of unlawful conduct.

### CLAIM 5
### FIRST AND FOURTEENTH AMENDMENT VIOLATIONS (FREE EXERCISE) UNDER 42 U.S.C. § 1983 (AGAINST BOTH DEFENDANTS)

207.    Plaintiff incorporates all previous allegations.

208.    Defendant Cuyahoga County has a custom, policy, pattern, or practice of requiring Muslims to relocate to different areas in the jail under the situations like those in Mr. Hipps's pod on November 3, 2018.

209.    Defendant Cuyahoga County has a custom, policy, pattern, or practice of using excessive force to enforce that requirement.

210.     Defendant Cuyahoga County violated Mr. Hipps's free-exercise rights by enforcing that policy against Mr. Hipps on November 3, 2018.

211.     Defendant Perdue violated Mr. Hipps's free-exercise rights when he physically assaulted and otherwise interfered with Mr. Hipps to prevent him from praying as mandated by his religion.

212.     As a direct and proximate result of Defendants' actions, Mr. Hipps suffered serious and painful personal injuries to both his body and mind, psychological damage, emotional distress, loss of standing in his community, damage to his reputation, and other damages.

213.     At all relevant times, Defendant Perdue acted with intent, malice, oppression, and a conscious disregard of Mr. Hipps's rights, and is liable to Mr. Hipps for punitive damages.

## CLAIM 6
### RELIGIOUS LAND USE AND INSTITUTIONALIZED PERSONS ACT,
### 42 U.S.C. § 2000CC *ET SEQ.* (AGAINST BOTH DEFENDANTS)

214.     Plaintiff incorporates all previous allegations.

215.     The Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc *et seq.*, prohibits prison officials from imposing a substantial burden on a prisoner's religious exercise unless that burden (1) furthers a compelling interest and (2) is the least restrictive means of furthering the interest.

216.     Defendants Cuyahoga County and Perdue receive federal funds.

217.     Defendants imposed substantial burdens on the exercise of Mr. Hipps's sincerely held religious beliefs through its refusal to:

    a.      provide proper halal meals;

    b.      allow Muslims to congregate for *Jumu'ah;*

    c.      use a clock to facilitate the properly timed offering of *salat*; and

    d.      permit him to offer *salat* in a suitable location.

218.     These refusals did not advance a compelling governmental interest.

219.     These refusals were not the least restrictive means of furthering any legitimate governmental interest.

220.     Jails and prisons across the country routinely permit such accommodations for Muslim inmates.

221.     Mr. Hipps has no history of abusing any religious accommodations extended to him.

222.     As a direct and proximate result of Defendants' conduct, Mr. Hipps suffered and will continue to suffer economic and non-economic damages for which Defendants are liable, including, but not limited to, mental, emotional, and physical pain and suffering.

223.     Defendant Perdue's acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter him and others from engaging in this type of unlawful conduct.

## CLAIM 7
### FIFTH AND FOURTEENTH AMENDMENT VIOLATIONS (DUE PROCESS) UNDER 42 U.S.C. § 1983 (AGAINST CUYAHOGA COUNTY)

224.     Plaintiff incorporates all previous allegations.

225.     Defendant Cuyahoga County denied Mr. Hipps his right to be heard regarding his medical complaints and grievances made in accordance with the Defendant's grievance policies, in violation of Mr. Hipps's procedural due process rights.

226.     As a direct and proximate result of Defendant's actions, Mr. Hipps suffered serious physical injuries and emotional distress. Mr. Hipps incurred expenses for medical care and treatment, and suffered a loss of earnings and earning capacity. His injuries are permanent in nature and will continue into the foreseeable future.

## CLAIM 8
### FIFTH AND FOURTEENTH AMENDMENT VIOLATIONS (EQUAL PROTECTION) UNDER 42 U.S.C. § 1983 (AGAINST BOTH DEFENDANTS)

227.     Plaintiff incorporates all previous allegations.

228.     Defendant Perdue violated Mr. Hipps's right to equal protection by assaulting him, as described above, for attempting to pray in accordance with his Islamic beliefs.

229.     Defendant Cuyahoga County violated Mr. Hipps's equal protection rights by failing to take corrective action against Defendant Perdue, and manifesting deliberate indifference to the religious discrimination against Mr. Hipps.

230.     Similarly situated non-Muslim inmates are not subjected to the same unconstitutional customs and policies.

231.     As a direct and proximate result of Defendants' actions, Mr. Hipps was deprived of his constitutional rights to freely exercise his religion and equal protection under the law, and suffered serious and painful personal injuries to both his body and mind, psychological damage, emotional distress, and other damages. Mr. Hipps incurred expenses for medical care and treatment, and has suffered a loss of earnings and earning capacity. His injuries and damages are permanent in nature and will continue into the foreseeable future.

232.     Defendant Perdue's acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter him and others from engaging in this type of unlawful conduct.

### CLAIM 9
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (AGAINST DEFENDANT PERDUE)

233.     Plaintiff incorporates all previous allegations.

234.     In conducting himself as he did, Defendant Perdue either intended to cause emotional distress or knew or should have known that the actions taken would result in serious emotional distress to Mr. Hipps.

235.     Defendant Perdue's conduct in choking, dragging, and body slamming Mr. Hipps was extreme and outrageous. Falsifying his report of the incident was extreme and outrageous. His

conduct went beyond all possible bounds of human decency and was such that it could be considered intolerable in civilized society.

236.   As a direct and proximate result of Defendant Perdue's unlawful conduct, Mr. Hipps has suffered and will continue to suffer mental anguish so serious and of such a nature that no reasonable person could be expected to endure it, and for which Defendants are liable.

237.   Defendant Perdue's acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter him and others from engaging in this type of unlawful conduct.

### CLAIM 10
### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (AGAINST DEFENDANT PERDUE)

238.   Plaintiff incorporates all previous allegations.

239.   Plaintiff was subjected to physical peril at the hands of Defendant Perdue.

240.   As a direct and proximate result of Defendant Perdue's unlawful conduct, Mr. Hipps has suffered and will continue to suffer serious mental anguish for which the Defendant is liable.

### CLAIM 11
### INTENTIONAL TORT—ASSAULT
### (AGAINST DEFENDANT PERDUE)

241.   Plaintiff incorporates all previous allegations.

242.   Defendant Perdue's above-described intentional actions caused Mr. Hipps reasonable apprehension of immediate harmful or offensive contact.

243.   As a direct and proximate result of Defendant Perdue's unlawful and sadistic conduct, Mr. Hipps suffered and will continue to suffer economic and non-economic damages for which this Defendant is liable, including, but not limited to, mental, emotional, and physical pain and suffering.

244.   Defendant Perdue's acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter this Defendant and others from engaging in this type of unlawful conduct.

## CLAIM 12
### INTENTIONAL TORT—BATTERY
### (AGAINST DEFENDANT PERDUE)

245.    Plaintiff incorporates all previous allegations.

246.    As described above, Defendant Perdue intended to cause a harmful contact with Mr. Hipps

and a harmful contact resulted. The offensive contact was unlawful and unwanted.

247.    As a direct and proximate result of Defendant Perdue's unlawful and sadistic conduct, Mr.

Hipps suffered and will continue to suffer economic and non-economic damages for which this

Defendant is liable, including, but not limited to, mental, emotional, and physical pain and suffering.

248.    Defendant Perdue's acts were willful, egregious, malicious, and worthy of substantial

sanction to punish and deter this Defendant and others from engaging in this type of unlawful

conduct.

## CLAIM 13
### CIVIL LIABILITY FOR CRIMINAL ACTS UNDER R.C. 2907.60
### (AGAINST DEFENDANT PERDUE)

249.    Plaintiff incorporates all previous allegations.

250.    The conduct complained of above constitutes criminal acts on the part of Defendant

Perdue. The crimes include, but are not limited to,

    a.    felonious assault (R.C. 2903.11(A)(1));

    b.    assault (R.C. 2903.13(A));

    c.    interfering with civil rights (R.C. 2921.45(A));

    d.    unlawful restraint (R.C. 2905.03(A));

    e.    dereliction of duty (R.C. 2921.44(C)(2));

    f.    falsification (R.C. 2921.13);

    g.    intimidation (R.C. 2921.03); and

    h.    intimidation of attorney, victim or witness in criminal case (2921.04).

251.     As a direct and proximate result of Defendant Perdue's intentional, knowing, and purposeful criminal conduct, which showed a spirit of ill-will, hatred, and wanton disregard of Mr. Hipps's rights, Mr. Hipps has suffered and will continue to suffer economic and non-economic damages for which Defendant Perdue is liable, including, but not limited to mental, emotional, and physical pain and suffering, as well as punitive damages.

252.     Defendant Perdue's acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter him and others from engaging in this type of unlawful conduct.

### CLAIM 14
### RECKLESS HIRING, TRAINING, SUPERVISION, DISCIPLINE, STAFFING, AND RETENTION (AGAINST DEFENDANT CUYAHOGA COUNTY)

253.     Plaintiff incorporates all previous allegations.

254.     Defendant Cuyahoga County failed to exercise due care and acted in a reckless manner in hiring, training, supervising, disciplining, staffing, and retaining Defendant Perdue.

255.     Defendant Cuyahoga County's reckless conduct in this regard proximately caused Mr. Hipps's injuries alleged above.

256.     As a direct and proximate result of the misconduct and abuse of authority detailed above, Mr. Hipps sustained the damages alleged above.

### CLAIM 15
### DESTRUCTION OF PUBLIC RECORDS UNDER R.C. 149.351 (AGAINST DEFENDANT CUYAHOGA COUNTY)

257.     Plaintiff incorporates all previous allegations.

258.     Where Mr. Hipps was located at the time of the events described above—Jail 1 Pod 9-E—was within the view of one or more mounted surveillance cameras and Defendant Perdue's body-worn camera.

259.     The video footage from the cameras within the jail are public records documenting the activities of the jail and its officials.

260.     Public records may not be removed, destroyed, mutilated, transferred, or otherwise damaged or disposed of except under a records-retention schedule approved by the county records commission, the state auditor, and the Ohio history connection (formerly the Ohio historical society).

261.     As of November 3, 2018 (the day Mr. Hipps was attacked), the County had no records-retention schedule that would permit the destruction of any surveillance or body-worn camera footage documenting the activities at the County jail.

262.     Under Ohio law, public records may be deleted only in accordance with an approved records-retention schedule.

263.     As of November 1, 2019 (the day Mr. Hipps filed this complaint), the County has no records-retention schedule that would permit the destruction of any surveillance or body-worn camera footage documenting the activities at the County jail.

264.     Because the County has no records-retention schedule authorizing the destruction of videos captured at the jail, it is obligated by law to keep those records indefinitely.

265.     The jail asserts that its surveillance cameras are motion-activated, and that lapses or freezes in its video footage are a result of insufficient motion or activity.

266.     There is no reasonable explanation for why portions of this footage—and the footage of so many other attacks on those in custody—allegedly does not exist.

267.     In the criminal trial over the abuse Joshua Castleberry endured, FBI agent Dennis Timony testified that he found evidence that jail videos had been destroyed.

268.     In August 2019, Idris-Farid Clark—who was already under indictment for the felonious assault of Chantelle Glass—was arrested and indicted for extortion of another corrections officer. According to the indictment, Clark offered to delete incriminating video of the other corrections officer and his or her involvement in a use-of-force incident. He was indicted again on October 23,

2019 over "bootleg" jail videos that were found in his possession. It is unknown whether the charges of tampering and unauthorized access relate to deletion or destruction of jail videos, or whether the videos found in his possession still exist on the County's system. The records seized from Clark may be the only copies of those public records that still exist.

269.     On information and belief, employees at the jail can alter, delete, rename, download, or otherwise destroy or tamper with surveillance and body-camera videos and other public records at the jail.

270.     Mr. Hipps is aggrieved by the destruction of the video evidence of the assault he suffered. Proving his civil claims will be more challenging without having all the video depicting precisely what transpired.

271.     Mr. Hipps commences this civil action for injunctive relief to compel compliance with R.C. 149.351(A), for his reasonable attorneys' fees incurred in this action, and for the civil forfeiture of $1,000 per violation for the destruction of the videos depicting the assault.

### PRAYER FOR RELIEF

For the reasons stated, Mr. Hipps respectfully requests the following relief from the Court:

A. Declare that Defendants' acts and conduct constitute violations of the First, Fifth, and Fourteenth Amendments to the United States Constitution, as well as of 42 U.S.C. § 1983, the Religious Land Use and Institutionalized Persons Act, and state law;

B. Enter judgment in Mr. Hipps's favor on all claims for relief;

C. Award full compensatory damages including, but not limited to, damages for pain and suffering, mental anguish, emotional distress, that Mr. Hipps have suffered and are reasonably certain to suffer in the future;

D. Award punitive and exemplary damages for the individual Defendant's egregious, willful, and malicious conduct;

E. Award pre- and post-judgment interest at the highest lawful rate;

F. Award Mr. Hipps his reasonable attorneys' fees and all other costs of suit;

G. Enjoin Defendants from perpetrating further unlawful acts such as the ones that injured Mr. Hipps;

H. Enjoin Defendant Cuyahoga County from any further acts of public-records destruction (including the specific directive to preserve all video footage captured at the jail until further notice);

I. Award Mr. Hipps $1,000 per violation of R.C. 149.351(A) for the County's destruction of the videos of Defendant Perdue's attack on Mr. Hipps; and

J. Award all other relief in law or equity, including injunctive relief, to which Mr. Hipps is entitled and that the Court deems equitable, just, and proper.

**JURY DEMAND**

Mr. Hipps demands a trial by jury on all issues within this complaint.

Respectfully submitted,

THE CHANDRA LAW FIRM LLC

*/s/ Ashlie Case Sletvold*
Ashlie Case Sletvold (0079477)
Subodh Chandra (0069233)
Brian D. Bardwell (0098423)
The Chandra Law Building
1265 W. 6th St., Ste. 400
Cleveland, Ohio 44113
216.578.1700 Phone
216.578.1800 Fax
Ashlie.Sletvold@ChandraLaw.com
Subodh.Chandra@ChandraLaw.com
Brian.Bardwell@ChandraLaw.com

*Attorneys for Plaintiff Tyrone Hipps, Jr.*

TAYEH LAW OFFICES, LLC

Ziad Tayeh (0088027)
11509 Lorain Ave.
Cleveland, OH 44111
440.580.0365 Phone
440.359.8755 Fax
ziadtayeh@tayehlaw.com

*Attorney for Plaintiff Tyrone Hipps, Jr*